UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL CASE NO. |
| | : | 3:97-CR-00204 (JCH) |
| v. | : | |
| | : | |
| NELSON GONZALEZ, | : | JULY 28, 2025 |
| Defendant. | : | |

**RULING ON MOTION TO REDUCE SENTENCE (DOC. NO. 600)**

**I.   INTRODUCTION**

The defendant, Nelson Gonzalez ("Mr. Gonzalez"), was sentenced to life in prison for his role in the murder of a young man, Edwin Ramos ("Mr. Ramos"), in 1997. Mr. Gonzalez now seeks a reduction in his sentence pursuant to the First Step Act of 2018, Pub. L. No. 115-391, § 603(b)(1). See Motion to Reduce Sentence ("Def.'s Mot.") (Doc. No. 600); Memorandum in Support of Motion to Reduce Sentence ("Def.'s Mem.") (Doc. No. 600-1); Reply in Support of Motion to Reduce Sentence ("Def.'s Reply") (Doc. No. 613). Mr. Gonzalez argues that a reduction in his sentence is appropriate because of his history of childhood trauma, unusually long sentence, excessively harsh conditions of confinement, and extraordinary rehabilitation. See Def.'s Mem. at 44–57. The government opposes the Motion. See Government's Opposition to Motion to Reduce Sentence (Doc. No. 608).

For the reasons that follow, the Motion is granted.

**II.   BACKGROUND**

On March 25, 1997, Ronald Pagan and Ruben Feliciano, both members of the Meriden, Connecticut chapter of Los Solidos street gang, murdered a 16-year-old boy named Edwin Ramos. Presentence Investigation Report ("PSR") (Doc. No. 559) at ¶¶

1

5–25.  Mr. Gonzalez, who was President of the Meriden chapter of the gang, ordered that Mr. Ramos be killed on the suspicion that Mr. Ramos had broken certain rules of the gang.  See id. at ¶¶ 20–21; Def.'s Mem. at 25.

On September 1, 1998, a grand jury indicted Mr. Gonzalez in Count One, with conspiracy to commit a violent crime in aid of racketeering, in violation of section 1959(a)(5) of title 18 of the U.S. Code, and in Count Two with the commission of a violent crime in aid of racketeering and aiding and abetting in violation of section 1959(a)(1) and (2) of the same title.  See Superseding Indictment (Doc. No. 144).

Beginning on January 19, 1999, the Honorable Peter C. Dorsey presided over Mr. Gonzalez's trial.  See Dkt. No. 323.  On February 8, 1999, a jury returned a verdict of guilty on both counts for which Mr. Gonzalez was indicted.  Verdict Form (Doc. No. 305).

On May 25, 1999, Judge Dorsey sentenced Mr. Gonzalez to 120 months imprisonment on Count One and life imprisonment on Count Two, with the sentences to run concurrently.  Judgment (Doc. No. 314).  The court was required to impose a mandatory minimum sentence of life imprisonment on Count Two.  See 18 USC § 1959(a)(1).

Mr. Gonzalez appealed his conviction and sentence; the Second Circuit affirmed both the conviction and the sentence imposed.  United States v. Feliciano, 223 F.3d 102, 126 (2d Cir. 2000).  The Supreme Court denied Mr. Gonzalez's Petition for Writ of Certiorari.  Gonzalez v. United States, 532 U.S. 943 (2001).  Mr. Gonzalez subsequently moved to vacate his sentence pursuant to section 2255 of title 28 of the U.S. Code; this court denied that Motion.  Ruling on Motion to Vacate, Set Aside, or

Correct Sentence and Motion to Amend (Doc. No. 384) at 39.  Mr. Gonzalez then sought miscellaneous relief, asking the court to exercise its discretion to request that the government consent to a reduction of his life sentence; this court denied that Motion. Ruling Re. Motion for Miscellaneous Relief (Doc. No. 447).

On July 28, 2020, Mr. Gonzalez filed his first Motion to Reduce Sentence. Motion to Reduce Sentence (Doc. No. 488).  Mr. Gonzalez filed a renewed Motion to Reduce Sentence on September 15, 2020.  Renewed Motion to Reduce Sentence (Doc. No. 496).  There, Mr. Gonzalez argued that his underlying medical conditions, the risks posed by the COVID-19 pandemic, his rehabilitation, and his youth at the time of the offense amounted to extraordinary and compelling circumstances warranting his early release from prison.  See Ruling Re. Renewed Motion to Reduce Sentence (Doc. No. 548).  While the court was impressed with Mr. Gonzalez's rehabilitation, it was unpersuaded by his remaining arguments and, accordingly, denied the Renewed Motion.  See id.  Mr. Gonzalez appealed the court's denial of his Renewed Motion to Reduce Sentence; the Second Circuit dismissed that appeal.  United States v. Feliciano, No. 21-1274, 2021 WL 5549664, at *1 (2d Cir. Oct. 7, 2021).

On May 20, 2024, Mr. Gonzalez filed the instant Motion.  See Def.'s Mot.  On January 29, 2025, the court heard arguments on the instant Motion, taking the Motion under advisement.  Minute Entry, January 29, 2025 (Doc. No. 623).

## III.     LEGAL STANDARD

Under section 3582(c)(1)(A) of title 18 of the U.S. Code, as modified by the First Step Act of 2018, an incarcerated defendant may move for compassionate release. See 18 U.S.C. § 3582(c)(1)(A).  Pursuant to section 3582(c)(1)(A)(i), a court may not modify a term of imprisonment "once it has been imposed" except in a case where, after

exhaustion of administrative remedies, the court considers the applicable section 3553(a) factors and finds that "extraordinary and compelling reasons warrant such a reduction." Id. § 3582(c)(1)(A)(i). "District courts may consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them." United States v. Fernandez, 104 F.4th 420, 427 (2d Cir. 2024), cert. granted in part, No. 24-556, 2025 WL 1496486 (U.S. May 27, 2025). The burden is on the defendant to show circumstances are present that warrant a reduction in the defendant's sentence. See id.; United States v. Jones, 17 F.4th 371, 375 (2d Cir. 2021).

## IV.   DISCUSSION

### A.   Exhaustion

An inmate may move for a sentence reduction only "after the [inmate] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [inmate]'s behalf or the lapse of 30 days from the receipt of such a request by the warden of the [inmate]'s facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).

On October 3, 2023, Mr. Gonzalez asked the Warden of his facility to reduce his sentence pursuant to section 3582(c). Def.'s Ex. XX (Doc. No. 600-38). The Warden denied Mr. Gonzalez's request. Def.'s Ex. YY (Doc. No. 600-39). Mr. Gonzalez filed the instant Motion on May 20, 2024, which was 30 days after the date of his letter to the Warden. See Def.'s Mot. The government agrees with Mr. Gonzalez that he has exhausted his administrative remedies. Gov'ts Opp'n at 7 n. 2. The court concludes that Mr. Gonzalez has satisfied the exhaustion requirement, and the court proceeds to the merits of his Motion.

### B. Extraordinary and Compelling Reasons

Congress, in enacting the First Step Act, did not define "extraordinary and compelling reasons[;]" however, the Second Circuit has explained "an 'extraordinary' reason is most unusual, far from common, and has little or no precedent," and a "compelling" reason "is both powerful and convincing." Fernandez, 104 F.4th at 428 (cleaned up and citations omitted).

Mr. Gonzalez asserts that there are several reasons that argue in favor of a reduction in his sentence. Those reasons are his: (1) rehabilitation; (2) age at the time of the offense paired with his history of severe childhood trauma; (3) unusually long sentence; and (4) experience with excessively harsh conditions of confinement, which, separately or in combination, amount to extraordinary and compelling reasons warranting his early release from prison. Def.'s Mem. at 46. The government opposes Mr. Gonzalez's arguments. See Gov't Opp'n at 7–17. The court will address each argument in turn.

#### 1. Extraordinary Rehabilitation

Rehabilitation alone cannot support a section 3582(c) sentence reduction; it may, however, be considered in conjunction with other reasons. See 28 U.S.C. § 994(t). As the Second Circuit noted in Brooker, extraordinary rehabilitation may "interact with" other circumstances to create extraordinary and compelling reasons for a sentence reduction. See United States v. Brooker, 976 F.3d 228, 238 (2d Cir. 2020). Mr. Gonzalez argues that his record while incarcerated shows he is committed to transforming himself for the better. Def.'s Mem. at 46. While acknowledging that Mr. Gonzalez has a "problem free" record of incarceration, the government argues that Mr.

Gonzalez's history suggests he responds well to "the restrictions of confinement[,]" but he is unlikely to be rehabilitated. Gov'ts Opp'n at 10–13.

Mr. Gonzalez's record while incarcerated is remarkable. Since Mr. Gonzalez was committed to the custody of the Bureau of Prisons in June of 1999, he has not received a single disciplinary ticket. Def.'s Mem. at 46; see also, Def.'s Ex. KK. Indeed, the court has reviewed a dozen letters from prison staff and current and former inmates; all of these letters describe Mr. Gonzalez as someone who is committed to his rehabilitation and acts as a role model to his fellow inmates. See Def.'s Exs. U–FF. As of this writing, Mr. Gonzalez has completed nearly 40 educational courses, earned 13 certificates, and obtained an associate's degree. See Def.'s Exs. HH–II. Equally as important, Mr. Gonzalez has been steadily employed while incarcerated since 2001 and, as of the January 29, 2025 hearing on the instant Motion, serves as the Head Orderly of an honors housing unit. See Def.'s Exs. NN–OO, AAA; Gonzalez Tr. at 22:25–23:2. Of the countless defendants with whom this court has come into contact over nearly 28 years, it is aware of only one whose record while incarcerated for this period of time is as impressive as that of Mr. Gonzalez.

While an inmate's exemplary record during his period of incarceration is not a guarantee that the inmate is truly rehabilitated, Mr. Gonzalez's record while incarcerated is extraordinary, and certainly strongly points in the direction of rehabilitation. If combined with other factors, Mr. Gonzalez's efforts to rehabilitate himself could amount to extraordinary and compelling circumstances warranting his early release from prison.

2. Youth and History of Severe Childhood Trauma

Mr. Gonzalez, who was 24 years of age when Mr. Ramos was murdered, argues that Mr. Gonzalez's history of severe childhood trauma, combined with his age at the

6

time of Mr. Ramos' murder, amount to an extraordinary and compelling reason favoring Mr. Gonzalez's release from prison. Def.'s Mem. at 48; Def.'s Reply at 7–9. The government responds that Mr. Gonzalez's traumatic childhood was known to the court at the time of sentencing; however, the government concedes that, while this trauma may have been known to the court, "[Mr.] Gonzalez's childhood history and mental condition were not factors when Judge Dorsey sentenced him in 1999 given the mandatory life sentence[.]" Gov'ts Opp'n at 15. The government argues further that the Bureau of Prisons is best positioned to "address the mental health needs of prisoners, as many prisoners deal with" such trauma, while also protecting the community from harm. Id.[1]

This court previously noted that, at 24 years old, Mr. Gonzalez was "on the very cusp" of late adolescence at the time of Mr. Ramos' murder. Ruling Re. Renewed Motion to Reduce Sentence at 10. Though Mr. Gonzalez may have been in his late adolescence, "the frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." United States v. Ramsay, 538 F. Supp. 3d 407, 417–18 (S.D.N.Y. 2021) (quoting Sara B. Johnson et al., Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy, 45 J. Adolescent Health 216 (2009) (NIH Public Access

---

[1] While the court might question the government's assertion that the Bureau of Prisons is best positioned to address prisoners who "deal with" trauma, the court will merely note that Mr. Gonzalez has been in the physical custody of the Bureau of Prisons for nearly 27 years. One would expect that, in that period of time, the Bureau of Prisons, if capable, would have "dealt" with Mr. Gonzalez's childhood trauma by now.

7

Version), available at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf, at 1. Thus, there is a scientific basis that Mr. Gonzalez's age, and related incomplete developed brain function, contributed to his actions and could be a factor supporting compassionate release.

In ruling earlier that Mr. Gonzalez's age did not by itself amount to an extraordinary and compelling reason, the court did not have before it the record of Mr. Gonzalez's childhood trauma.  See Ruling Re. Renewed Motion to Reduce Sentence (Doc. No. 548).  Now, having reviewed Mr. Gonzalez's psychological evaluations and reports from the Connecticut Department of Children and Youth Services, there is substantial evidence that Mr. Gonzalez suffered severe and persistent trauma as a child and adolescent.  Def.'s Exs. C, E, UU, WW, DDD.  Indeed, one psychologist, Doctor Robin Belcher-Timme, Psy.D., ABPP, CCHP-A ("Dr. Timme"), who evaluated Mr. Gonzalez's childhood history, estimated that Mr. Gonzalez experienced "a level of childhood adversity greater than 99.9% of the population."  Def.'s Mem. at 61 (citing Def.'s Ex. C ("Dr. Timme's Report")).  This court, having come into contact with hundreds, perhaps thousands, of criminal defendants, many of whom have tragically suffered poor childhoods, cannot now recall another criminal defendant before it whose childhood trauma was as severe and extensive as that of Mr. Gonzalez.

Combining Mr. Gonzalez's age with his history of childhood trauma certainly supports the conclusion that they together present an extraordinary and compelling reason warranting a reduced sentence.  As the Sentencing Guidelines provide, "[c]ertain risk factors may affect a youthful individual's development <u>into the mid-20's</u>

8

and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, . . . and familial relationships." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 5H1.1 (emphasis added). Indeed, "[n]eurological studies have concluded that severe childhood trauma is associated with changes to 'the maturation of specific brain structures at particular ages' and a person's 'capacity to coordinate cognition, emotion regulation, and behavior.'" United States v. Rengifo, 569 F. Supp. 3d 180, 194 (S.D.N.Y. 2021) (citing Bessel A. van der Kolk, "The Neurobiology of Childhood Trauma and Abuse," 12 Child Adolesc. Psychiatric Clin. N. Am. 293, 294 (2003)). While Mr. Gonzalez may have been on the "very cusp" of late adolescence at the time of Mr. Ramos' murder, Mr. Gonzalez's severe childhood trauma, paired with his age, supports the conclusion that his cognitive function was impaired. See Dr. Timme Report at 22 ("Mr. Gonzalez would have consistently been in a state of survival . . . . Functioning in this state of constant autonomic arousal limits cognitive functioning and results in a myopic focus on survival and reacting constantly to perceived threat."). This court joins other courts within the Second Circuit in concluding that extraordinary and compelling circumstances may be present when a criminal defendant, who has experienced severe childhood trauma, commits a crime in his late adolescence. United States v. Glynn, No. 06-CR-580 (JSR), 2022 WL 562652 (S.D.N.Y. Feb. 24, 2022) (reducing the sentence of a defendant, who was 22 years old when he ordered the murder of two people, on account of his "relative youth" in conjunction with his rehabilitation, long sentence, and chronic health problems); Rengifo, 569 F. Supp. 3d at 194 (concluding that the sentence of a defendant, who was 23 years old at the time of the offense, should be reduced in part because of the defendant's youth and traumatic

childhood).  With respect to Mr. Gonzalez, the court concludes that his history of childhood trauma, combined with his late adolescence at the time of Mr. Ramos' murder, supports the conclusion that Mr. Gonzalez is less morally culpable for his participation in the offense, and supports a finding of extraordinary and compelling reasons warranting his early release.

        3.        Unusually Long Sentence

Mr. Gonzalez argues that his life sentence is unusually long and amounts to an extraordinary and compelling reason warranting his early release.  Def.'s Mem. at 52–54; Def.'s Reply at 17–18.   The government opposes this argument, asserting that pursuant to the Sentencing Guidelines, Mr. Gonzalez's sentence is not an extraordinary and compelling reason.  Gov'ts Opp'n at 15–17.  The government argues further that, were Mr. Gonzalez sentenced today for his role in the murder of Mr. Ramos, Mr. Gonzalez would still receive the same life sentence that he received in 1999.  Id. at 16–17.  Indeed, the government notes that there is nothing unusual about a life sentence for a defendant convicted of murder.  Id. at 16.

District courts in the Second Circuit have concluded an unusually long sentence resulting from mandatory minimum requirements may amount to an extraordinary and compelling reason warranting a sentence reduction.  E.g., United States v. Lespier, No. 3:98-CR-102 (SVN), 2025 WL 213732, at *3 (D. Conn. Jan. 16, 2025) ("it is clear a sentence of life in prison is an unusually long sentence, among all federal sentences imposed."); United States v. Williams, No. 09-CR-00558 (CM), 2023 WL 4785286, at *8 (S.D.N.Y. July 27, 2023) (concluding that a 25-year mandatory minimum sentence constituted an extraordinary and compelling reason warranting a sentence reduction).  Mindful that a mandatory minimum sentence may be considered unusually long and

amount to an extraordinary and compelling reason warranting a sentence reduction, the court considers whether Mr. Gonzalez's sentence, specifically, is unusually long.

Mr. Gonzalez was in his mid-twenties when he was arrested for the instant offenses; he is in his mid-fifties today.  See Def.'s Mem. at 49, 62.  That means Mr. Gonzalez has been in federal custody for the instant offenses for more than half of his entire life, and all of his adult life.  In the event Mr. Gonzalez lives to be 72 years old, he will have spent about two-thirds of his life in prison.  The year Mr. Gonzalez was sentenced, 1999, the national average length of imprisonment for a defendant whose primary offense category was murder was approximately 17 years.  1999 Federal Sentencing Statistics, 2nd Circuit, U.S. Sentencing Commission, Tbl. 7, https://perma.cc/HD86-7FHY.[2]  Mr. Gonzalez, by comparison, has already served approximately 31 years in prison, when good time and First Step Act credits are included.  Further, while Mr. Gonzalez is serving a life sentence, approximately eighty-percent of defendants convicted of murder in the federal court system are sentenced to some term of imprisonment that is less than life.  Glenn R. Schmitt, Hyun J. Konfrst, Life Sentences in the Federal System, U.S. Sentencing Commission, 5 (Feb. 2015), https://perma.cc/RT89-DQQL.  The effect is that Mr. Gonzalez, who the court considers to be of some lessened moral culpability for Mr. Ramos' murder in light of his age and childhood trauma, will serve significantly more time than the average defendant convicted of murder in the federal system.

---

[2] In the fiscal year 2024, the average sentence imposed for murder in federal court was about 23 years.  2024 Federal Sentencing Statistics, 2nd Circuit, U.S. Sentencing Commission, Tbl. 7, https://perma.cc/K2EH-EBV6

11

While the government may be correct that a life sentence for murder is not uncommon in the federal system, the Second Circuit "has emphasized the discretion of district courts to assess whether a sentence is unusually or overly long in a particular case." Lespier, 2025 WL 213732, at *4 (citing Brooker, 976 F.3d at 238). In light of the court's conclusion that Mr. Gonzalez is of a somewhat reduced moral culpability due to his age and childhood trauma at the time of the offense, the court concludes further that Mr. Gonzalez's life sentence is unusually long and amounts to an exceptional and compelling circumstance supporting a sentence reduction.

4.  Excessively Harsh Conditions of Confinement

Mr. Gonzalez argues that he was subject to excessively harsh conditions of confinement while imprisoned for the instant offenses. According to Mr. Gonzalez, he was held in solitary confinement for 18 months and was subject to "draconian" lockdowns during the COVID-19 pandemic during which he witnessed frequent violence. Def.'s Mem. at 54–57. Mr. Gonzalez asserts that, as a result of these harsh conditions, he suffered physical and psychological injuries, which further suggest that he has experienced excessively harsh conditions of confinement. See Def.'s Mem. at 54. The government responds only that the harsh conditions Mr. Gonzalez experienced "adds little to the combination of factors alleged to be extraordinary and compelling." Gov'ts Opp'n at 17.

While the court is unpersuaded that lockdown measures instituted during the COVID-19 pandemic amount to excessively harsh conditions of confinement, the court is persuaded that the 18 months during which Mr. Gonzalez was subject to solitary confinement was excessively harsh, especially considering that he has never received a

disciplinary ticket while incarcerated for the instant offenses.[3]  The court reaches this conclusion because it cannot be doubted that "[y]ears on end of near-total isolation exact a terrible price."  Davis v. Ayala, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) (citing Stuart Grassian, "Psychiatric Effects of Solitary Confinement", 22 Wash. U.J.L. & Pol'y 325 (2006)).  Indeed, "there is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."  Gallina v. Wilkinson, 988 F.3d 137, 148 (2d Cir. 2021) (Pooler, J. dissenting) (quoting Williams v. Sec'y Pa Dep't of Corr., 848 F.3d 549, 566 (3d Cir. 2017).

For these reasons, the court concludes that Mr. Gonzalez's 18 months in solitary confinement amounts to an excessively harsh condition of confinement which, when combined with other factors discussed above, support the court's conclusion that there are extraordinary and compelling circumstances in Mr. Gonzalez's case that warrant the court's conclusion that a sentence reduction is warranted.

*   *   *

Having considered the arguments made by Mr. Gonzalez and the Government, the court concludes that Mr. Gonzalez has demonstrated, through a combination of factors, extraordinary and compelling reasons under section 3582(c) that warrant a reduction in his sentence.

### C.   Section 3553(a) Factors

The court must now consider whether a sentence reduction is warranted in consideration of the factors enumerated in section 3553(a).  Those factors include: "the

---

[3] It appears to the court that Mr. Gonzalez was placed in solitary confinement for unspecified "non-disciplinary" reasons.  See Hearing Tr. at 20:18–24.

nature and circumstances of the offense;" "the history and characteristics of the defendant;" the need for the sentence to: "reflect the seriousness of the offense;" "afford adequate deterrence to criminal conduct;" "protect the public from further crimes of the defendant;" and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1)–(2). The court must also consider "the kinds of sentence and the sentencing range established" by the Sentencing Guidelines in effect at sentencing for this category of offense and defendant;"[4] and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. at § 3553(a)(4)(A) and (6).

1. Seriousness and nature of the offense

Regarding the nature and seriousness of Mr. Gonzalez's conduct, there is no crime more serious than murder, and those convicted of such a heinous crime ought to be severely punished. Mr. Gonzalez ordered his subordinates within Los Solidos to murder Mr. Ramos. See, supra, part II. Indeed, but for Mr. Gonzalez's order, it seems unlikely that Mr. Ramos would have been murdered. Accordingly, the sentence imposed upon Mr. Gonzalez ought to be substantial.

2. Sentencing Disparities

A defendant convicted of murder in the federal court system in the fiscal year 1999, served approximately 17 years in prison. See, supra, part IV.B.3. In the fiscal year 2024, the average sentence imposed upon a defendant convicted of murder in the

---

[4] The Sentencing Guidelines in effect at the time of Mr. Gonzalez's sentencing were mandatory and called for life imprisonment. See, supra, part II.

14

federal court system was about 23 years.  2024 Federal Sentencing Statistics, 2nd Circuit, U.S. Sentencing Commission, Tbl. 7, https://perma.cc/K2EH-EBV6.

In view of federal sentencing practices, the court concludes that reducing Mr. Gonzalez's life sentence, of which he has already served approximately 31 years, including good time and First Step Act credits, would not create an unwarranted disparity between Mr. Gonzalez and similarly situated offenders.

        3.      Deterrence, Protection of the Public, and Correctional Treatment

While it is impossible to know for certain whether Mr. Gonzalez would recidivate if released from prison now, his extraordinary record while incarcerated suggests that his risk of recidivism is low.  As an inmate serving a life sentence, Mr. Gonzalez could not benefit from good time credit awarded to inmates for good behavior.  Though Mr. Gonzalez lacked this incentive, his behavior in prison has been exemplary.  He has not received a single disciplinary ticket during his many decades of incarceration.  See, supra, part IV.1.  Further, Mr. Gonzalez has taken thousands of hours of courses, obtained steady employment while in prison, and earned an associate's degree.  Id.  As the court has already summarized, prison staff and current and former inmates praise Mr. Gonzalez for his commitment to his rehabilitation.  Id.  Perhaps the best evidence that Mr. Gonzalez poses a low risk to the public is that, although receiving a life sentence for a murder, he is housed in a low security federal correctional institution and has been assessed by the Bureau of Prisons to be at a "Minimum Risk Recidivism Level."  See Def.'s Mem at 2; Def.'s Ex. LL.  Indeed, as Dr. Timme notes in her report:

> Mr. Gonzalez began his sentence in the Secure Housing Unit of a United States Penitentiary, was one of the first such sentenced prisoners to be eligible and transfer to a Federal Correctional Institution at medium security, and still one of the first to then be eligible and transfer to a Federal Correctional Institution at low security.  Over the course of his life sentence, Mr. Gonzalez traveled from the

15

>highest security housing unit at the highest level of custody, to an honor housing unit in a low security facility . . . . I would be very surprised if there has ever been another person incarcerated in the Bureau of Prisons to have accomplished this feat of progressive movement to lower levels of custody and risk."

Dr. Timme Report at 15. The court concurs with the Bureau of Prisons and Dr. Timme that Mr. Gonzalez, based on his history, poses a minimum risk of recidivism and, thus, further prolonged incarceration is not necessary to protect the public.

        4.        Personal History and Characteristics

Mr. Gonzalez suffered abhorrent and persistent abuse as a child and adolescent. See Def.'s Mem. at 6–14. Even worse, the perpetrators of this abuse were the adults entrusted to care for Mr. Gonzalez during his most formative years. See id. Not only was Mr. Gonzalez's home a place of torment, but his surrounding neighborhood was also marred by poverty, violent crime, and racism. Id. at 7–8, 16–18. In short, there were few—if any—places where Mr. Gonzalez could find comfort, direction, or safety while growing up.

With regard to the events underlying the instant offenses, it took many years for Mr. Gonzalez to accept responsibility for his central role in Mr. Ramos' murder. See Ruling Re. Renewed Motion to Reduce Sentence at 11–12. However, the court credits Mr. Gonzalez for more recently accepting responsibility and expressing his remorse for his role in the murder of Mr. Ramos to the victim's family and to the court. Gonzalez Tr. at 42:6–25. While Mr. Gonzalez did not immediately accept responsibility for his actions, he did renounce his association with Los Solidos in 1998 and has encouraged others to similarly renounce their gang affiliations. Def.'s Mem. at 3.

Finally, the court incorporates here its discussion of Mr. Gonzalez's history of rehabilitation while imprisoned. See, supra, part IV.B.1. That history, which reflects Mr.

16

Gonzalez's personal characteristics, is extraordinary and weighs heavily in his favor as a section 3553(a) factor.

* * *

Having weighed and considered all of the applicable section 3553(a) factors, the court concludes that a reduction in Mr. Gonzalez's sentence is appropriate in light of the extraordinary and compelling reasons discussed above.

## V. CONCLUSION

The court concludes that extraordinary and compelling reasons counsel in favor of reducing Mr. Gonzalez's prison sentence. After carefully considering all of the applicable section 3553(a) factors, the court concludes that it is appropriate to reduce Mr. Gonzalez's sentence. On Count One, the court reimposes a sentence of 120 months imprisonment, a sentence Mr. Gonzalez has effectively already served. On Count Two, the court imposes a sentence of time served as of September 17, 2025. This is a sufficient, but not greater than necessary, sentence to achieve the purposes of sentencing and is based on the court's finding of extraordinary and compelling circumstances. The court directs the Bureau of Prisons to release Mr. Gonzalez from its custody on September 17, 2025.

The court places Mr. Gonzalez on a 3-year term of supervised release on Count One and a 5-year term of supervised release on Count Two, all to run concurrently. As a special condition of Mr. Gonzalez's supervised release, he must reside in a Residential Reentry Center for the first two months of his release from prison. The Clerk is directed to issue an Amended Judgment consistent with this Ruling, which Amended Judgment will set forth all conditions of supervised release, including the additional special condition of supervised release of two months in a Residential

Reentry Center. The reason for imposition of this special condition is to permit Mr. Gonzalez a period of time to adjust to living in the community after decades of being incarcerated. This Amended Judgment will specify the terms of the special, mandatory, and standard conditions to which Mr. Gonzalez will be subject on supervised release, as imposed by Judge Dorsey in 1999. Judgment (Doc. No. 314) at 1–2. In the next two months, the court requests the United States Probation Office to review the other conditions imposed at sentencing nearly 30 years ago, discuss the conditions with Mr. Gonzalez, and his counsel, and then recommend any conditions that should be added, modified, or deleted given the passage of time.

    For the reasons stated above, the court grants the Motion to Reduce Sentence (Doc. No. 600) on Count Two to a sentence of time served as of September 17, 2025, and on Count One, a concurrent sentence of 120 months already served.

**SO ORDERED.**

    Dated at New Haven, Connecticut this 28th day of July 2025.

                                       /s/ Janet C. Hall
                                       Janet C. Hall
                                       United States District Judge